UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| SCHUMACHER FARMS CATTLE COMPANY, LLC and JOSEPH SCHUMACHER, | Civil No.  4:25-cv-4239 |
| Plaintiffs, | |
| vs. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| BRIAN LILLIE, BEST BEEF VENTURES, LLC, BEST BEEF HOLDINGS, LLC, and COLOMBO CAPITAL US, LLC, | |
| Defendants. | |

COMES NOW Plaintiffs Schumacher Farms Cattle Company, LLC, and Joseph Schumacher, by and through their attorneys of record, and for their Complaint and causes of action against the above-named Defendants, state and allege as follows:

### Parties & Jurisdiction

1.     Plaintiff Schumacher Farms Cattle Company, LLC, is a South Dakota limited liability company with its principal place of business located in Beresford, South Dakota.

2.     Plaintiff Joseph Schumacher is an individual residing in Beresford, South Dakota.

3.     Upon information and belief, Defendant Brian Lillie is an individual residing in Wallace, North Carolina.

1

4.      Upon information and belief, Defendant Best Beef Ventures, LLC, is a Missouri limited liability company with its principal place of business located in Springfield, Missouri.

5.      Upon information and belief, Defendant Best Beef Holdings, LLC, is a Missouri limited liability company with its principal place of business located in Springfield, Missouri.

6.      Upon information and belief, Defendant Colombo Capital US, LLC, is a Massachusetts limited liability company with its principal place of business located in Burlington, Massachusetts.

7.      This Court has subject matter jurisdiction over this action under 28 USC 1332(a)(1) because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between Plaintiffs and all Defendants.

8.      This Court has personal jurisdiction over Defendants because each has purposefully directed business activity toward, and caused injury within, the State of South Dakota.

9.      Defendant Brian Lillie is subject to personal jurisdiction in South Dakota because he personally directed numerous communications into South Dakota to Plaintiffs concerning the negotiation, delivery, payment, and settlement of transactions for wagyu cattle and beef.  Lillie repeatedly made representations to Plaintiffs in South Dakota about imminent payment, financing, and settlement, knowing that his statements would be acted upon and would cause harm to Plaintiffs in this District.

10.     Defendant Best Beef Ventures, LLC, is subject to personal jurisdiction in South Dakota because it, acting through its officer, owner, and agent Defendant Lillie, purposefully transacted business with Plaintiffs in South Dakota.  Best Beef Ventures, LLC, through Defendant Lillie, solicited and arranged for the purchase, delivery, processing, and resale of Plaintiffs' wagyu cattle and beef and caused foreseeable injury to Plaintiffs in this District.

11.     Defendant Best Beef Holdings, LLC, is subject to personal jurisdiction in South Dakota because it shares common ownership, management, and operations with Best Beef Ventures, LLC, and because Defendant Lillie held himself out and acted as an officer and authorized representative of Best Beef Holdings, LLC, in connection with the transactions described herein.  Through Lillie's conduct and the benefits Lillie and his entities derived from the transactions with Plaintiffs, Best Beef Holdings, LLC, caused foreseeable injury to Plaintiffs in this District.

12.     Defendant Colombo Capital US, LLC, is subject to personal jurisdiction in South Dakota because, in the course of business, it directed numerous representations of fact to Plaintiff regarding Defendant Lillie's and his companies' financial condition, their forthcoming financing, and their ability to pay Plaintiffs in full for wagyu cattle and beef that Colombo Capital US, LLC, knew or should have known would induce Plaintiffs' reliance and cause injury to Plaintiffs in South Dakota.  These representations of fact by Colombo Capital US, LLC, to Plaintiffs occurred over a period of several months, from at least March 2025 through September or October 2025.

13.    Venue is proper in the United States District Court, District of South Dakota, Southern Division, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including Plaintiffs' performance of their obligations, their reliance on Defendants' representations, and the injuries suffered by Plaintiffs in Beresford, South Dakota.

14.    The exercise of jurisdiction over Defendants in this District comports with the Due Process Clause of the United States Constitution and with South Dakota's long-arm statute, SDCL 15-7-2.

### Factual Background

15.    Plaintiff Schumacher Farms Cattle Company, LLC ("Schumacher Farms"), is a South Dakota cattle operation owned and operated by Plaintiff Joseph Schumacher ("Schumacher") that raises, finishes, and sells high-quality wagyu cattle and beef. Schumacher Farms, like other local cattle operations, generally conducts its business on the basis of handshake agreements and invoices with its customers.

16.    Upon information and belief, Defendant Brian Lillie ("Lillie") is the founder, principal, and CEO of Defendants Best Beef Ventures, LLC ("BBV"), and Best Beef Holdings, LLC ("BBH").  Lillie conducts business under the "Best Beef" name and brand and represented that his Best Beef entities procured, processed, marketed, and sold beef worldwide.  Lillie viewed his partnership with Schumacher as a way to insert himself in the global wagyu beef market.  At all times relevant, Lillie acted and held himself out as an officer, owner, and authorized representative of BBV and BBH, using both entities interchangeably to conduct business.

17.     In or about late Spring 2024, Schumacher was introduced to Lillie and the two discussed the prospect of Lillie and his Best Beef companies purchasing, processing, and reselling Schumacher Farms' wagyu cattle.  During these discussions, Lillie represented that he had markets for high-value wagyu products, that his Best Beef entities had the infrastructure to process and distribute such products at scale, and that Schumacher Farms would be paid in full for all cattle upon their delivery.

18.     Subsequently, Schumacher and Lillie discussed the prospect of Lillie and his Best Beef companies selling Schumacher Farms' inventory of frozen wagyu beef under the Best Beef brand.  Under this arrangement, Lillie would essentially act as a broker:  Lillie would sell the frozen beef and pay Schumacher the profits after taking a commission for his efforts.  Lillie assured Schumacher that he had strong markets for high-value wagyu beef and that Schumacher would be paid accordingly once the frozen beef was sold.

19.     Following these discussions, Schumacher Farms and Lillie reached two agreements.  Under the first agreement, Schumacher Farms agreed to sell and deliver wagyu cattle to Lillie and his affiliated entities (including BBV and BBH) for processing and resale under the Best Beef brand.  The parties agreed on the quantities and pricing and Lillie agreed that Schumacher Farms would be paid for the cattle delivered for processing and resale under the Best Beef brand.

20.     Under the second agreement, Schumacher Farms agreed to sell and deliver its inventory of frozen wagyu beef to Lillie and his affiliated entities (including BBV and BBH) for resale and distribution through his Best Beef markets.  The parties understood,

based on Lillie's representations, that Lillie would act in a broker-type role. He would market and sell the frozen beef, retain a commission for his efforts, and remit the remaining sale proceeds to Schumacher Farms. At no time did Lillie or his affiliated entities dispute that payment for the frozen beef was owed.

21.    Between approximately August 2024 and October 2024, Schumacher Farms fully performed under both agreements. Schumacher delivered multiple shipments of wagyu cattle and frozen wagyu beef from Beresford, South Dakota, to third-party processing and cold-storage facilities designated by Lillie and his affiliated entities. Each facility operated at Lillie's and/or his affiliated entities' instruction regarding Schumacher Farms' cattle and beef. Each load was accompanied by invoices, wagyu affidavits, and shipping records.

22.    On or about August 7, 2024, Schumacher Farms delivered live wagyu cattle valued at approximately $2,704,755 plus $32,869.03 in trucking costs. At Lillie's and/or his affiliated entities' direction, the cattle were delivered to processing plants which slaughtered the animals under the Best Beef name. The meat was labeled, certified, and controlled under the Best Beef brand. As a result, Schumacher Farms could not reclaim or access the product once processed.

23.    After processing, the meat derived from Schumacher Farms' cattle was transported to cold-storage facilities designated by Lillie and/or his affiliated entities for warehousing and sale. Lillie and his Best Beef entities controlled the storage arrangements, resale, and distribution of the processed product.

24.     On or about October 7, 2024, Schumacher Farms delivered frozen wagyu beef valued at approximately $1,927,330 to a cold-storage facility for Lillie's and/or his affiliated entities' benefit. The frozen beef was placed into storage under Best Beef's name to be held and sold through Best Beef's sales network.

25.     At all relevant times, Lillie and the Best Beef entities exercised possession and control over Schumacher Farms' wagyu cattle and frozen beef through their designated processors and storage facilities. Defendants never rejected the products, never raised any complaints, never returned them, and never paid for them. Instead, they processed, warehoused, and sold the products and retained the proceeds.

26.     After Schumacher Farms completed delivery of all wagyu cattle and frozen beef, Lillie repeatedly assured Schumacher that the agreed-upon payment would be forthcoming. From the outset, Lillie never disputed the quantity, quality, or price of the products. Instead, he repeatedly claimed that payment was delayed due to temporary financing or banking issues and consistently assured Schumacher that Schumacher Farms would be paid in full. Such representations and assurances were made by Lillie to Schumacher countless times over the next year and continued up until Schumacher hired counsel to initiate collection efforts.

27.     The web of lies represented by Lillie to Schumacher includes, but is not limited to, Lillie providing shifting explanations and timelines, claiming at times that wire transfers were pending, that they had sent the wire to the wrong account, that financing was being finalized, or that administrative paperwork was the only remaining

step.  These assurances were made to induce Schumacher's patience and to discourage Schumacher Farms from pursuing immediate collection or legal remedies.

28.    This pattern of delay, excuse, and evasion persisted for months.  Whenever Schumacher inquired about payment, Lillie acknowledged the debt, promised that funds were "on the way," or came up with a new excuse as to the nonpayment.

29.    As Lillie's explanations grew increasingly inconsistent, Schumacher asked Lillie to provide receipts, sales records, processing documentation, and accounting for the cattle and frozen beef that Lillie had taken control of.  Schumacher's banker also requested this information so the bank could understand when payment would be received and evaluate Schumacher Farms' loan obligations.  Lillie never produced any such documentation.

30.    In January 2025, after months of avoidance, Lillie and his affiliated entities offered Schumacher Farms to settle their dispute and resolve all outstanding amounts owed for the cattle and frozen beef by paying Schumacher Farms the outstanding principal amount of $5,000,000.  Schumacher Farms promptly accepted this settlement offer, and the parties had a binding contract under South Dakota law.

31.    Lillie and his affiliated entities never paid Schumacher Farms the agreed upon settlement amount.  The offer appears to have been another fraudulent tactic to prevent Schumacher from taking action.  Relying on Lillie's promise to pay the outstanding principal, Schumacher refrained from initiating legal action or collection efforts, believing the matter would soon be resolved.

32.     Following the settlement agreement, Lillie continued his pattern of delay, false promises, and avoidance.  As Schumacher grew increasingly desperate to be paid, Lillie's fraudulent tactics became more blatant and calculated.

33.     Lillie began making more specific representations that payment was imminent, going so far as to request Schumacher's bank routing and account information so that Lillie could wire the funds immediately.  Schumacher provided that information at once.  Lillie then claimed he initiated the transfer, only later to insist that the funds had been sent to the "wrong account."

34.     In connection with Lillie's false promises and fabricated explanations regarding payment, he introduced Defendant Colombo Capital US, LLC ("Colombo"), a private equity firm Lillie represented was arranging funding for Best Beef's operations.

35.     Lillie represented to Schumacher that Colombo was arranging funds in the millions that would allow Lillie and his affiliated entities to pay all outstanding amounts owed to Schumacher Farms.  Throughout the time Schumacher was seeking payment, Lillie repeatedly invoked Colombo's name to reassure Schumacher that payment was imminent and to dissuade Schumacher Farms from pursuing collection or legal remedies.

36.     Lillie first told Schumacher that Colombo was securing a financing package totaling approximately $110 million.  Lillie stated that, once those funds were received, he would pay Schumacher Farms in full.  To induce Schumacher to rely on that representation, Lillie forwarded an email purportedly from a Colombo representative, Joe Raffa, stating that an ACH transfer of funds was coming into Colombo Capital "today"

and that those funds were designated for Lillie and his affiliated companies to be received "this week."

37.    When the promised transfer did not occur, Lillie arranged for Stephen McLaughlin, Colombo's Chief Executive Officer, to personally speak with Schumacher about the alleged forthcoming funds.  McLaughlin confirmed Lillie's statements, assuring Schumacher that Colombo was closing a large financing transaction and that payment to Schumacher Farms would follow.

38.    When the supposed $110 million transaction failed to materialize, Lillie again contacted Schumacher, claiming that a separate multimillion-dollar financing would close "within a week."  Once again, Lillie arranged for McLaughlin to confirm the details directly to both Schumacher and Schumacher's banker.  McLaughlin told them that the deal was about to close, and that Schumacher Farms would be paid in full as soon as the funds cleared.

39.    Weeks later, Lillie claimed that Colombo had secured $40 million in new financing.  Lillie and McLaughlin again represented to Schumacher and his banker that the financing was complete and that all that remained was to "sign via DocuSign" to release the funds.  Both Lillie and McLaughlin stated that Schumacher Farms would be paid in full "within a week."

40.    None of these assurances from Lillie or Colombo came to fruition.  Neither Lillie or Colombo provided Schumacher with documentation or confirmation that such funding ever existed, was available, or was intended to satisfy the debt owed to Schumacher Farms.  These representations were made to induce Schumacher to delay

collection efforts and to provide Defendants additional time while they retained control of the proceeds from Schumacher Farms' cattle and beef.

41.    At one point during this period, Schumacher personally visited Lillie at his new meat processing plant in Missouri.  During that meeting, Lillie showed Schumacher what appeared to be an online bank account containing a nine-figure balance, assuring Schumacher that the money was there, but that Lillie was just waiting on paperwork. This meeting reinforced the same false narrative that substantial Colombo financing existed, and payment to Schumacher Farms was imminent.

42.    Lillie's misrepresentations did not stop with financing.  On one occasion, he told Schumacher that Lillie had been incurring significant storage fees for the Schumacher Farms' frozen wagyu beef because it had not yet been sold.  However, when Schumacher contacted one of Lillie's agents who was responsible for reselling the frozen beef that supposedly was incurring storage costs, the agent told Schumacher that they had sold his meat months ago.

43.    Upon information and belief, during the period in which Lillie retained proceeds from Schumacher Farms' cattle and beef, he was simultaneously funding and preparing to open a new processing facility under the Best Beef name.  Lillie told Schumacher that once the plant was up and running, Lillie would be able to pay Schumacher Farms.

44.    As a result of Defendants' false promises, lies, misrepresentations, delay, and refusal to pay, Schumacher Farms suffered significant financial harm.  The wagyu cattle and beef Schumacher Farms sold to Lillie and his entities served as collateral for

Schumacher Farms' agricultural operating loans. When Lillie failed to pay, Schumacher Farms lost the ability to service those loans, triggering penalties, extensions, and additional interest obligations.

45.    Schumacher Farms incurred hundreds to thousands of dollars in additional costs and damages directly attributable to Lillie's nonpayment, including interest, renewal fees, and late charges on financing secured by the cattle and beef. These losses were a foreseeable and natural consequence of Lillie's failure to pay as agreed and Defendants' repeated inducements that caused Schumacher Farms to delay enforcing its rights.

46.    Lillie's prolonged refusal to pay and Defendants' repeated false assurances caused severe financial distress to Schumacher and his family. As a direct result of Defendants' conduct and the resulting hardship, Schumacher has experienced significant emotional distress, including stress-related health complications requiring hospitalization and medical treatment.

47.    On October 9, 2025, Schumacher's counsel sent Lillie a formal demand letter itemizing the principal, interest, and consequential damages then due, totaling $6,428,723.98. The letter provided Lillie until October 20, 2025, to remit full payment.

48.    Lillie did not pay. Instead, his counsel responded by letter dated October 20, 2025, predictably denying liability but admitting that BBV had processed, warehoused, and sold the wagyu cattle and beef. BBV claimed it had applied the sale proceeds to offset alleged "processing costs" and continued to deny that any contract of sale existed.

49.     Lillie's new explanations are inconsistent with his conduct and the record. For more than a year after delivery, Lillie never raised any complaint about the quality of the cattle or beef.  Instead, he repeatedly acknowledged the debt and promised full payment.

### Count I: Breach of Contract (Live Wagyu Cattle)
### *(Defendants Lillie, BBV, and BBH)*

50.     Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

51.     In or about mid-2024, Schumacher Farms and Lillie, acting individually and as the authorized representative of BBV and BBH, entered into a valid and enforceable oral contract for the sale of live wagyu cattle.

52.     Under the agreement, Schumacher Farms agreed to sell and deliver live wagyu cattle to Defendants for processing and resale under the Best Beef brand. Defendants agreed to pay Schumacher Farms for all live wagyu cattle delivered and accepted, together with related trucking costs.

53.     Schumacher Farms fully performed its obligations by delivering live wagyu cattle to Defendants.  Defendants received and accepted the live wagyu cattle, caused them to be processed under the Best Beef name, and exercised possession and control over the resulting beef products.

54.     Defendants never rejected the live wagyu cattle and never disputed the quantity, quality, or agreed pricing.  Defendants' acceptance of the live wagyu cattle and

13

subsequent processing and sale under the Best Beef name constituted acknowledgement of full performance by Schumacher Farms.

55.     Despite repeated demands and numerous assurances of imminent payment, Defendants failed and refused to pay Schumacher Farms for the live wagyu cattle and related costs, thereby materially breaching the parties' agreement.

56.     At all relevant times, Lillie acted as the founder, principal, and authorized agent of BBV and BBH, and used those entities interchangeably to conduct business under the "Best Beef" name.  Accordingly, both BBV and BBH are jointly and severally liable for the contractual obligations incurred by Lillie in connection with the cattle transaction.

57.     As a direct and proximate result of Defendants' breach, Schumacher Farms has suffered in the amount of $2,737,644.03, plus statutory interest at 10% per annum from August 7, 2024, and all consequential and compensatory damages as allowed by law to be proven at trial.

### Count II: Breach of Contract (Frozen Beef)
#### *(Defendants Lillie, BBV, and BBH)*

58.     Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

59.     In or about mid-2024, Schumacher Farms and Lillie, acting individually and as the authorized representative of BBV and BBH, entered into a valid and enforceable oral contract for the sale of frozen wagyu beef.

60.     Under the agreement, Schumacher Farms agreed to sell and deliver its inventory of frozen wagyu beef to Defendants for resale and distribution under the Best Beef brand.  Defendants agreed to pay Schumacher Farms for all frozen wagyu beef received and accepted.

61.     On or about October 7, 2024, Schumacher Farms fully performed its obligations by delivering frozen wagyu beef valued at approximately $1,927,330 to a cold-storage facility designated by Lillie for Defendants' benefit.  The product was stored, marketed, and resold under the Best Beef name and at Defendants' direction.

62.     Defendants never rejected the frozen wagyu beef, never disputed its quality or condition, and never returned any portion of the product.  Defendants' acceptance, storage, and resale of the beef under the Best Beef brand constituted acknowledgment of full performance by Schumacher Farms.

63.     Despite repeated demands and numerous assurances of imminent payment, Defendants failed and refused to pay Schumacher Farms for the frozen wagyu beef, thereby materially breaching the parties' agreement.

64.     At all relevant times, Lillie acted as the founder, principal, and authorized agent of BBV and BBH, and used those entities interchangeably to conduct business under the "Best Beef" name.  Accordingly, both BBV and BBH are jointly and severally liable for the contractual obligations incurred by Lillie in connection with the frozen wagyu beef transaction.

65.     As a direct and proximate result of Defendants' breach, Schumacher Farms has suffered damages in the amount of $1,927,330, plus statutory interest at 10% per

annum from October 7, 2024, and all consequential and compensatory damages as allowed by law to be proven at trial.

### Count III: Breach of Contract (Settlement Agreement)
### *(Defendants Lillie, BBV, and BBH)*

66.    Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

67.    In or about January 2025, Schumacher Farms and Lillie, acting individually and as the authorized representative of BBV and BBH entered into a valid and enforceable oral settlement agreement to resolve all outstanding debts arising from Defendants' purchase, processing, and resale of Schumacher Farms' wagyu cattle and frozen beef.

68.    Under the settlement agreement, Lillie agreed on behalf of himself, BBV, and BBH to pay $5,000,000 to Schumacher Farms in full satisfaction of all amounts owed.  In exchange, Schumacher agreed to forbear from initiating legal or collection actions and to allow additional time for payment.

69.    Schumacher accepted Lillie's offer and relied on his promise, refraining from pursuing any immediate collection efforts or legal remedies.

70.    Defendants failed to pay the $5,000,000 as promised and have never tendered any portion of that amount.  Lillie's offer and subsequent assurances of payment were false and made solely to induce Schumacher to continue delaying enforcement.

71.    At all relevant times, Lillie acted as the founder, principal, and authorized agent of BBV and BBH, and represented that he had authority to bind those entities in

settlement of this dispute.  Accordingly, BBV and BBH are jointly and severally liable for Lillie's breach of the settlement agreement.

72.     As a direct and proximate result of Defendants' breach, Schumacher Farms has suffered damages in the amount of $5,000,000, plus statutory interest at 10% per annum, together with all consequential and compensatory damages allowed by law to be proven at trial.

### Count IV: Promissory Estoppel
### *(Defendants Lillie, BBV, and BBH)*

73.     Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

74.     Lillie, acting individually and as the authorized representative of BBV and BBH, made clear and definite promises to Schumacher Farms that:  (a) Defendants would pay Schumacher Farms in full for the wagyu cattle and frozen wagyu beef delivered; and (b) Lillie and his companies would promptly pay $5,000,000 to settle the outstanding amounts owed.

75.     Lillie and his companies expected and intended that Schumacher Farms would rely on these promises by refraining from pursuing immediate collection or legal action and by continuing to cooperate with Defendants' ongoing efforts to sell and distribute the cattle and beef under the Best Beef brand.

76.     Plaintiffs reasonably relied on Defendants' promises.  Relying on Defendants' repeated assurances of imminent payment, Plaintiffs deferred collection, extended their credit exposure, and incurred substantial additional financing costs.

77.    Schumacher Farms' reliance was foreseeable and induced directly by Defendants' repeated representations and conduct.

78.    At all relevant times, Lillie acted as the founder, principal, and authorized agent of BBV and BBH and used those entities interchangeably to conduct business under the "Best Beef" name.  Accordingly, all three Defendants benefitted from the cattle and beef supplied by Schumacher Farms and are jointly and severally liable for their promissory estoppel.

79.    Defendants failed to honor their promises, resulting in substantial financial harm to Schumacher Farms, including the loss of over $6.4 million in unpaid principal, statutory interest, and consequential damages to be proven at trial.

## Count V: Unjust Enrichment
### (Defendants Lillie, BBV, and BBH)

80.    Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

81.    Under South Dakota law, the elements of unjust enrichment are: (a) defendant received a benefit at plaintiff's expense; (b) defendant is cognizant of the benefit; and (c) defendant's retention of the benefit without reimbursing plaintiff would unjustly enrich him or her.  *Juttelstad v. Juttelstad*, 1998 S.D. 121, ¶ 19, 587 N.W.2d 447, 451.

82.    Schumacher Farms conferred substantial benefits upon Defendants by delivering live wagyu cattle and frozen wagyu beef that Defendants accepted, processed, warehoused, and sold under the Best Beef name.

83.     Defendants knew of and appreciated these benefits.  They directed the receipt, processing, and resale of the wagyu cattle and beef, exercised control over the proceeds, and used those proceeds for their own business operations and financial gain.

84.     Defendants retained the benefits of Schumacher Farms' cattle and beef without paying for them.  Despite repeated demands and promises of payment, Defendants have failed and refused to remit any portion of the sums owed.

85.     At all relevant times, Lillie acted as the founder, principal, and authorized agent of BBV and BBH and used those entities interchangeably to conduct business under the "Best Beef" name.  Accordingly, all three Defendants benefitted from the cattle and beef supplied by Schumacher Farms and are jointly and severally liable for restitution.

86.     It would be unjust and inequitable to allow Defendants to retain the value of the wagyu cattle and beef provided by Schumacher Farms without payment.  Equity therefore requires that Defendants disgorge all amounts wrongfully retained and compensate Schumacher Farms for the full value of the benefits conferred plus statutory interest and consequential damages as permitted by law.

### Count VI: Fraud and Deceit
*(Defendants Lillie, BBV, and BBH)*

87.     Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

88.     Lillie, acting individually and as the authorized representative of BBV and BBH, knowingly made numerous false representations to Schumacher Farms concerning material facts related to payment for wagyu cattle and frozen wagyu beef.

89.     Beginning in or about August 2024, and continuing through October 2025, Lillie repeatedly represented to Schumacher that payment for the cattle and beef had been arranged and would be made this week, within a week, or "within days." These statements were false when made. Lillie made them personally by telephone and email to Schumacher.

90.     Lillie further represented that payment was delayed only due to temporary banking or financing issues and that Schumacher would be paid in full once those issues cleared. He repeated these assurances dozens of times despite knowing no such payment was forthcoming.

91.     When Schumacher and his banker requested documentation and accounting regarding all of Best Beef's handling of Schumacher's cattle and beef, Lillie ignored the requests and produced no receipts.

92.     In January 2025, Lillie told Schumacher that he would pay $5 million to settle all outstanding amounts owed. This statement was false when made and intended solely to induce Schumacher to forbear from legal action.

93.     After the alleged settlement, Lillie's deceit continued. In March 2025, he requested Schumacher's bank routing and account information, stating that he was "getting ready to send the money." Schumacher provided the information the same day.

Lillie later claimed he had "sent the money to the wrong account." That statement was knowingly false and made to prolong Schumacher's reliance.

94.     Lillie also fabricated explanations about "storage fees," telling Schumacher that BBV was incurring expenses for unsold frozen wagyu beef and that payment would be made once the product sold. When Schumacher contacted Lillie's own sales agent, the agent told Schumacher that BBV sold his meat "months ago." Lillie's prior statements were therefore false and made to conceal his conversion of Schumacher's product.

95.     At one meeting in Missouri, Lillie showed Schumacher what appeared to be an online bank account reflecting a nine-figure balance assuring Schumacher they were just waiting for paperwork to pay Schumacher Farms in full. This was another knowingly false representation intended to convince Schumacher that payment was imminent.

96.     Lillie made each of these misrepresentations with knowledge of their falsity or reckless disregard for their truth and with the intent to induce Schumacher and Schumacher Farms to rely upon them, to delay enforcement, and to allow Lillie and his companies to retain and profit from Schumacher Farms' cattle and beef.

97.     At all relevant times, Lillie acted as the founder, principal, and authorized agent of BBV and BBH and used those entities interchangeably to conduct business under the "Best Beef" name. Accordingly, all three Defendants are jointly and severally liable for Lillie's fraud and deceit.

98.    Schumacher and Schumacher Farms justifiably relied on these representations.  In reliance, he and Schumacher Farms refrained from initiating collection or legal action, extended additional credit exposure, and incurred significant financial losses.

99.    As a direct and proximate result of Defendants' fraudulent conduct, Schumacher Farms has suffered damages exceeding $6,428,723.98, plus statutory interest and all other fraud damages allowed to be recovered by law, which will be proven at trial.

100.    Defendants' conduct was willful, wanton, and malicious, justifying an award of punitive damages under SDCL 21-3-2 to deter similar misconduct.

### Count VII: Conversion
*(Defendants Lillie, BBV, and BBH)*

101.    Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

102.    Schumacher Farms owned and had the right to possession of the wagyu cattle and frozen wagyu beef described above until payment was made in full.

103.    Defendants Lillie, BBV, and BBH exercised dominion and control over Schumacher Farms' cattle and beef by:  (a) directing and arranging the processing of Schumacher Farms' cattle under the Best Beef name; (b) causing the resulting wagyu beef to be labeled, warehoused, and sold under Defendants' brand; and (c) retaining and using the proceeds from those sales for Defendants' own benefit.

104.    Defendants' exercise of control was without Schumacher Farms' consent and inconsistent with Schumacher Farms' ownership and right to possession.

Schumacher retained title to the cattle and beef until payment was received, but Defendants disposed of the goods and proceeds as their own.

105.   Defendants never remitted payment to Schumacher Farms and have continued to withhold both the property and the proceeds derived from it.  When Schumacher and his banker requested documentation and accounting of Lillie's handling of Schumacher Farms' products, Lillie ignored the requests, further evidencing Defendants' conversion of Schumacher Farms' property.  Defendants' actions constitute a wrongful conversion of Schumacher Farms' property.

106.   At all relevant times, Lillie acted personally and as the principal, officer, and agent of BBV and BBH, directing and controlling the conduct that constituted conversion.  Accordingly, all three Defendants are jointly and severally liable.

107.   As a direct and proximate result of Defendants' conversion, Schumacher Farms has suffered damages to be proven at trial.

108.   Defendants' conversion was willful and in conscious disregard of Schumacher Farms' ownership rights, entitling Schumacher Farms to an award of punitive damages under SDCL 21-3-2.

## Count VIII: Tortious Interference with Business Expectancy
### *(Defendants Lillie, BBV, and BBH)*

109.   Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

110.   Schumacher Farms maintained valid and ongoing business relationships and expectancies with multiple financial institutions and agricultural partners, including

its primary lender, and cattle ranchers, buyers, sellers, and processors who relied on Schumacher's performance, reputation, and financial stability.

111.    Lillie, BBV, and BBH were aware of Schumacher Farms' reliance on these relationships and of the need to maintain solvency and credibility with lenders and cattle ranchers, buyers, sellers, and processors in order to continue its operations.

112.    Defendants intentionally and unjustifiably interfered with those relationships and expectancies by:  (a) knowingly misrepresenting to Schumacher and his banker that payment was forthcoming; (b) causing Schumacher to delay collection efforts and default on loan obligations; and (c) portraying Schumacher as responsible for nonperformance and poor-quality product in order to shift blame and deflect liability.

113.    Defendants' conduct was not privileged, was undertaken in bad faith, and served no legitimate business purpose other than to avoid payment and preserve Defendants' own financial position.

114.    At all relevant times, Lillie acted personally and as the principal, officer, and agent of BBV and BBH, directing and controlling the tortious conduct.  Accordingly, all three Defendants are jointly and severally liable.

115.    As a direct and proximate result of Defendants' interference, Schumacher Farms suffered significant damages to be proven at trial, including, but not limited to, damage to its business reputation, loss of goodwill and financing opportunities, increased borrowing costs, and other damages to be proven at trial.

116.    Defendants' actions were willful, wanton, and malicious, entitling Schumacher Farms to an award of punitive damages under SDCL 21-3-2.

## Count IX: Negligent Misrepresentation
### *(Defendants Lillie, BBV, and BBH)*

117.    Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

118.    Lillie, acting individually and as the authorized representative of BBV and BBH, made numerous false statements to Schumacher Farms concerning payment for the cattle and frozen beef delivered to Defendants.

119.    Specifically, Lillie made misrepresentations including, but not limited to, that:  (a) payment had been arranged and would be wired "within days"; (b) only minor banking or administrative issues were temporarily delaying payment; (c) funds were being transferred and would clear imminently; (d) Defendants were incurring "storage fees" because the frozen beef had not yet sold; (e) Schumacher would be paid in full as soon as these purported issues were resolved; and (f) Schumacher Farms would be paid in full within a week, today, or this week.

120.    These statements were made during multiple telephone calls, emails, and in-person meetings between approximately August 2024 and October 2025.

121.    Lillie made these representations without reasonable grounds for believing them to be true.  Defendants had not arranged payment, had not initiated any valid transfer, and had already sold significant amounts of Schumacher's beef without paying for it.

122.    Lillie made these statements with the intent to induce Schumacher Farms to delay collection efforts, refrain from legal remedies, continue extending credit, and allow

Defendants to retain control over Schumacher Farms' cattle, beef, and the proceeds from their sale.

123.    In actual and justifiable reliance on Lillie's representations, Schumacher Farms refrained from initiating suit, delayed collection efforts, and incurred increased borrowing costs, interest, penalties, and other financial hardship on their operating loans.

124.    At all relevant times, Lillie acted personally and as the principal, officer, and agent of BBV and BBH, directing and controlling the tortious conduct.  Accordingly, all three Defendants are jointly and severally liable.

125.    As a direct and proximate result of Defendants' negligent misrepresentations, Schumacher Farms suffered damages to be proven at trial.

126.    Defendants' conduct demonstrated a reckless disregard for the truth and for Schumacher Farms' financial welfare, entitling Plaintiffs to punitive damages under SDCL 21-3-2.

### Count X: Negligent Infliction of Emotional Distress
### *(Defendants Lillie, BBV, and BBH)*

127.    Plaintiff Joseph Schumacher realleges and incorporates all the above paragraphs as though fully set forth herein.

128.    Defendants Lillie, BBV, and BBH acted negligently by, among other things:  (a) failing to exercise reasonable care in handling, processing, and accounting for Schumacher Farms' cattle and beef; (b) failing to exercise reasonable care in communicating truthful information regarding payment, financing, and the status of funds owed; (c) providing inaccurate and misleading information regarding purported delays or

obstacles to payment; and (d) negligently causing prolonged and extreme financial pressure on Schumacher Farms.

129.    As a direct result of Defendants' negligent conduct and prolonged nonpayment, Schumacher experienced severe emotional distress, including acute stress, anxiety, and continued financial fear associated with the inability to meet operating loan obligations, keep his business solvent, and support his family.

130.    Defendants' negligence legally caused this emotional distress.  Defendants knew or reasonably should have known that withholding payment for more than a year while repeatedly providing false or inaccurate information would foreseeably cause Schumacher significant emotional and financial harm.

131.    Schumacher's emotional distress manifested in physical symptoms.  During the period of Defendants' prolonged nonpayment and misleading conduct, Schumacher experienced severe stress-related health issues requiring multiple hospital visits and medical evaluation.  Schumacher's symptoms included physical pain, loss of sleep, elevated and lowered blood pressure, and other bodily manifestations directly attributable to the emotional and financial strain caused by Defendants' negligence.

132.    At all relevant times, Lillie acted personally and as the principal, officer, and agent of BBV and BBH, directing and controlling the tortious conduct.  Accordingly, all three Defendants are jointly and severally liable.

133.    As a direct and proximate result of Defendants' negligent infliction of emotional distress, Schumacher Farms and Joseph Schumacher have suffered damages to be proven at trial.

## Count XI: Intentional Infliction of Emotional Distress
### *(Defendants Lillie, BBV, and BBH)*

134.    Plaintiff Joseph Schumacher realleges and incorporates the above paragraphs as though fully set forth herein.

135.    Lillie, BBV, and BBH engaged in extreme and outrageous conduct by deliberately deceiving Schumacher for more than a year regarding payment for the wagyu cattle and beef they had accepted, processed, and sold.

136.    Defendants intentionally strung Schumacher along with fabricated wire transfers, false promises of imminent payment, invented banking problems, and knowingly false statements about "storage fees" and unsold product—all while they had already sold the beef and retained the proceeds.

137.    Defendants further escalated their deception through a campaign of deliberate misrepresentations designed to prevent Schumacher from taking action to protect his livelihood, including:  (a) falsely claiming that a $5 million settlement payment was forthcoming; (b) requesting Schumacher's routing and bank information under the pretense of initiating a nonexistent wire transfer; (c) falsely stating that the wire was sent to the "wrong account"; (d) lying that frozen beef remained unsold when, in fact, their own sales agent stated the product had been sold "months ago"; and (e) showing Schumacher what appeared to be a nine-figure bank account balance to create the illusion that payment was imminent.

138.    Defendants engaged in this conduct intentionally and with full knowledge that Schumacher depended on payment to meet his operating loan obligations, maintain

his business, and support his family.  Defendants either intended to cause Schumacher severe emotional distress or acted in reckless disregard of the high probability that their conduct would result in such harm.

139.    Defendants' conduct was extreme and outrageous, going far beyond the bounds of decency and falling squarely into conduct intolerable in a civilized community.

140.    As a direct and proximate result of Defendants' conduct, Schumacher suffered severe emotional distress, including debilitating stress, anxiety, sleeplessness, physical pain, and fear of financial collapse and bankruptcy.  Schumacher's distress was so severe that it resulted in multiple hospital visits and medical evaluation for stress-related physical symptoms.

141.    At all relevant times, Lillie acted personally and as the principal, officer, and agent of BBV and BBH, directing and controlling the tortious conduct.  Accordingly, all three Defendants are jointly and severally liable.

142.    Defendants' conduct was willful, malicious, and carried out with conscious disregard for Schumacher's rights and well-being, entitling Plaintiffs to punitive damages pursuant to SDCL 21-3-2.

### Count XII: Piercing the Corporate Veil
*(Defendant Lillie)*

143.    Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

144.    Under South Dakota law, piercing the corporate veil is analyzed under a two-part test:  (a) was there such unity of interest and ownership that the separate

personalities of the corporation and its shareholders, officers or directors are indistinct or non-existent; (b) would adherence to the fiction of separate corporate existence sanction fraud, promote injustice or inequitable consequences or lead to an evasion of legal obligations?

145.    At all relevant times, Lillie exercised complete dominion and control over BBV and BBH, using both entities interchangeably and without regard to corporate formalities.

146.    Lillie held himself out as the owner, principal, and chief executive of both entities, used both names and branding in his communications with Schumacher Farms, and represented that he alone had the authority to negotiate pricing, direct processing and storage, control the resale of wagyu beef, and make binding payment commitments on behalf of both BBV and BBH.

147.    Upon information and belief, BBV and BBH shared common ownership, management, operations, and financial control under Lillie and lacked meaningful separation in their business activities.  Lillie caused both entities to be used as conduits for his personal directives in connection with the cattle and frozen beef transactions.

148.    Lillie used BBV and BBH as alter egos to obtain the benefits of Schumacher Farms' cattle and beef while shielding himself from personal liability, including directing the acceptance, processing, warehousing, and sale of the products and retaining—or causing the entities to retain—the proceeds without payment.

149.    Adhering to the corporate separateness of BBV and BBH would sanction fraud, promote injustice, and permit Lillie to evade legal obligations.  Lillie used the

entities to make false assurances of payment, to delay and obstruct Schumacher Farms' efforts to collect, and to conceal the disposition of the proceeds of the cattle and beef.

150.    Under these circumstances, BBV and BBH functioned as the alter egos of Lillie, and the corporate veil should be pierced to hold Lillie personally liable for all obligations, torts, and damages arising from the conduct described in this Complaint.

### Count XIII: Fraud and Deceit
### *(Defendant Colombo)*

151.    Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth herein.

152.    Defendant Colombo, acting through its personnel, including, but not limited to, Joe Raffa and Stephen McLaughlin, knowingly made false representations of material fact to Plaintiffs concerning the existence, status, and imminence of financing allegedly arranged for Defendant Lillie and his Best Beef entities.

153.    In or about March 2025, Colombo—through representative Joe Raffa—sent communications to Defendant Lillie who forwarded the communication to Schumacher stating that an "ACH transfer" of funds to Lillie was scheduled "this week," which would enable immediate payment to Schumacher Farms thereafter.  These statements were false when made and were communicated for the purpose of inducing Schumacher Farms to delay collection efforts.

154.    When the promised transfer did not occur, Colombo's CEO, Stephen McLaughlin, participated in multiple phone calls with Schumacher and Schumacher's banker during which McLaughlin expressly confirmed that:  (a) Colombo was closing a

financing package totaling approximately $110 million for Lillie; (b) the only remaining step was routine paperwork; and (c) Schumacher Farms would be paid in full as soon as the funds cleared.  These statements were false when made and were intended to reinforce Lillie's misrepresentations.

155.    After the supposed $110 million financing failed to materialize, Colombo— again through McLaughlin—represented to Schumacher and Schumacher's banker that Colombo had secured a separate multi-million-dollar financing package that would close "within a week," and that Schumacher Farms would be paid promptly upon closing.  This representation was false and made to induce continued reliance.

156.    In or about September 2025, Colombo and McLaughlin represented again to Schumacher and his banker that Colombo had secured $40 million in financing, that final documents were being executed through DocuSign, and that payment to Schumacher Farms would occur "within a week."  These statements were knowingly false or made with reckless disregard for their truth.

157.    Colombo made these misrepresentations intentionally, or with reckless disregard for the truth, and with the intent to induce Plaintiffs to refrain from initiating suit or attempting to recover the proceeds of the cattle and beef Lillie had sold.  Colombo knew that Plaintiffs' ability to collect depended on timely and accurate information regarding payment and financing.

158.    Plaintiffs reasonably and justifiably relied on Colombo's representations. The involvement of a purported private equity firm and its CEO added credibility to

Lillie's assurances and caused Plaintiffs to delay enforcing their rights, extend further time for payment, and incur additional financing costs, penalties, and loan extensions.

159.    As a direct and proximate result of Colombo's fraudulent and deceitful conduct, Plaintiffs suffered damages to be proven at trial.

160.    Colombo's conduct was willful, malicious, and in conscious disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages under SDCL 21-3-2.

### Count XIV: Negligent Misrepresentation
### *(Defendant Colombo)*

161.    Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth herein.

162.    Defendant Colombo, acting through its personnel, made multiple false and/or recklessly misleading statements to Plaintiffs regarding the existence, status, and imminence of financing purportedly available to Defendant Lillie and his Best Beef entities for the purpose of paying Plaintiffs the amounts owed for their live wagyu cattle and frozen wagyu beef.

163.    Specifically, Colombo communicated to Plaintiffs that:  (a) Colombo was finalizing a $110 million financing package that was ready to close; (b) only routine paperwork remained before the funds would be released; (c) Plaintiffs would be paid in full upon closing; (d) after that financing collapsed, a separate multimillion dollar financing would close "within a week"; and (e) Colombo had secured $40 million in new financing and all that remained was execution of documents through DocuSign before Plaintiffs would be paid "within a week."

164.    These statements were made by Colombo's personnel during multiple telephone calls and email communications between approximately March 2025 and September 2025, including at least one call involving Plaintiffs' banker.

165.    Colombo made these representations without reasonable grounds for believing them to be true. Colombo did not have verified or secured financing available for Lillie and lacked a reasonable basis to assure Plaintiffs that the funds would be available to Lillie and that that payment was imminent.

166.    Colombo made these statements with the intent to induce Plaintiffs to take or refrain from taking specific action—namely, to forbear from initiating legal action, to delay collection efforts, and to continue extending time for Defendants to pay.

167.    Plaintiffs relied on Colombo's representations actually and justifiably. Colombo held itself out as a legitimate financing source and its CEO personally confirmed financing details, adding credibility to Lillie's repeated assurances.

168.    As a result of their reliance on Colombo's statements, Plaintiffs refrained from timely enforcing their rights, extended their exposure to additional interest and penalties on their agricultural loans, continued deferring collection efforts, and suffered substantial financial harm.

169.    As a direct and proximate result of Colombo's negligent misrepresentations, Plaintiffs suffered damages to be proven at trial.

## Count XV: Civil Conspiracy
### *(All Defendants)*

170.    Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth herein.

171.    Defendants knew Schumacher Farms was owed millions of dollars from the live wagyu cattle and frozen beef it had delivered to Lillie and his affiliated entities.

172.    Defendants came to an agreement or understanding, expressly or impliedly, under which Defendants, or anyone of them, would make misrepresentations of fact and/or lie to Schumacher Farms about the alleged forthcoming financing and payments for the live wagyu cattle and frozen beef.

173.    The object or purpose of this agreement or understanding was to make Schumacher Farms believe Lillie and his affiliated companies were going to pay for the live wagyu cattle and frozen beef, so that Schumacher Farms would delay collection efforts and legal action against Lillie and his affiliated entities.

174.    Defendants all committed overt unlawful acts in furtherance of the conspiracy as described in more detail above.

175.    Plaintiffs have suffered damages as a direct and proximate result of this conspiracy.

## Count XVI: Punitive Damages
### *(Defendants Lillie, BBV, BBH, and Colombo)*

176.    Plaintiffs reallege and incorporate the above paragraphs as though fully set forth herein.

177.    Plaintiffs have alleged multiple independent torts against all Defendants.

178.    Under South Dakota law, punitive damages may be awarded when a defendant has acted with willful, wanton, or malicious conduct, or in conscious and reckless disregard of the rights of others.  SDCL 21-3-2.

179.    Defendants have acted willfully, wantonly, and maliciously by engaging in the foregoing conduct.

180.    Defendants' conduct was undertaken with conscious disregard for Plaintiffs' rights and with full awareness that Plaintiffs would suffer severe financial, emotional, and physical harm as a result.

181.    Defendants' tortious conduct, individually and collectively, was of such a character as to warrant the imposition of punitive damages to punish past misconduct and deter similar conduct in the future.

182.    Plaintiffs therefore seek punitive damages against all Defendants in an amount sufficient to punish, deter, and make an example of each Defendant's misconduct, in an amount to be determined by the jury.

**WHEREFORE**, Plaintiffs Schumacher Farms Cattle Company, LLC, and Joseph Schumacher request that the Court enter judgment in their favor and against Defendants Brian Lillie, Best Beef Ventures, LLC, Best Beef Holdings, LLC, and Colombo Capital US, LLC, jointly and severally where permitted by law, and award the following relief:

1.  Compensatory damages in amounts to be proven at trial, including, but not limited to, the value of the live wagyu cattle and frozen beef delivered, unpaid principal, the agreed upon settlement amount, statutory interest, consequential losses, and all tort damages.

2.  Emotional distress, mental anguish, pain and suffering, loss of enjoyment of life, past medical expenses, and future medical expenses to be proven at trial.

3.  Restitution or disgorgement of all proceeds Defendants obtained from Plaintiffs' cattle and beef.

4.  Punitive damages under SDCL 21-3-2.

5.  Prejudgment interest at the statutory rate of 10% per annum on all economic losses.

6.  Attorneys' fees, costs, and expenses as permitted by law.

7.  Equitable relief, including piercing the corporate veil to hold Brian Lillie personally liable.

8.  Such other and further relief as the Court deems just and proper.

### TRIAL BY JURY IS HEREBY DEMANDED

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated December 8, 2025.

LYNN, JACKSON, SHULTZ & LEBRUN, P.C.


By:  */s/ Cesar A. Juarez*
     Cesar A. Juarez
     Attorneys for Plaintiffs
     110 N. Minnesota Avenue, Suite 400
     Sioux Falls, SD  57104-6475
     605-332-5999
     cjuarez@lynnjackson.com

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Schumacher Farms Cattle Company, LLC and Joseph Schumacher

### DEFENDANTS

Brian Lillie, Best Beef Ventures, LLC, Best Beef Holdings, LLC, and Colombo Capital US, LLC

**(b)** County of Residence of First Listed Plaintiff __Lincoln County, SD__
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Lynn, Jackson, Shultz & Lebrun, P.C., 110 N. Minnesota Avenue, Suite 400, Sioux Falls, SD 57104; 605-332-5999

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [x] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[x] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>[ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>[ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332(a)(1)

Brief description of cause:
Breach of contract, misrepresentation, and fraud concerning the sale of wagyu cattle and beef.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
12/08/2025

SIGNATURE OF ATTORNEY OF RECORD
*(signature)*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____