UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SCHUMACHER FARMS CATTLE COMPANY, LLC, JOSEPH SCHUMACHER,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIAN LILLIE, BEST BEEF VENTURES, LLC, BEST BEEF HOLDINGS, LLC, COLOMBO CAPITAL US, INC.,<br><br>Defendants. | 4:25-CV-04239-RAL<br><br>OPINION AND ORDER GRANTING MOTIONS TO DISMISS |

Defendants Brian Lillie, Best Beef Ventures, LLC (BBV), and Best Beef Holdings, LLC (BBH), and Defendant Colombo Capital US, Inc. (Colombo) filed separate motions to dismiss the First Amended Complaint of Plaintiffs Schumacher Farms Cattle Company, LLC (SFCC), and Joseph Schumacher. All Defendants argued they are not subject to personal jurisdiction in South Dakota. Doc. 44 at 15; Doc. 22 at 9. For the reasons explained below, this Court grants the motions to dismiss. This Court withholds entering judgment of dismissal for thirty days to give the Plaintiffs time to file a motion to transfer if they so choose.

## I. Background

### A. Procedural History

SFCC and Schumacher sued Lillie, BBV, BBH, and Colombo in this Court alleging 16 claims for relief. Docs. 1, 10. Counts I, II, and III of the First Amended Complaint assert breach-of-contract claims against Defendants Lillie, BBV, and BBH concerning the oral agreements

involving live wagyu cattle, frozen wagyu beef, and a claimed settlement agreement to pay Plaintiffs $5 million. Doc. 10 ¶¶ 50–72. Counts IV and V are promissory estoppel and unjust enrichment claims against Lillie, BBV, and BBH concerning the live cattle and frozen beef transactions. Id. ¶¶ 73–86. Counts VI and IX contain fraud and deceit and negligent misrepresentation claims against Lillie, BBV, and BBH for their misrepresentations made throughout 2024 and 2025. Id. ¶¶ 87–100, ¶¶ 117–126. Count VII asserts a conversion claim against Lillie, BBV, and BBH concerning their dominion and control over Plaintiffs' cattle and frozen beef. Id. ¶¶ 101–108. Count VIII brings a claim for tortious interference with business expectancy against Lillie, BBV, and BBH regarding Plaintiffs' inability to make payments on other transactions because of these delays in payment. Id. ¶¶ 109–116. Counts X and XI assert negligent and intentional infliction of emotional distress claims against Lillie, BBV, and BBH. Id. ¶¶ 127–142. Count XII contains a piercing the corporate veil claim against Lillie, claiming that Lillie used BBV and BBH as his alter ego to seize SFCC assets and avoid personal liability. Id. ¶¶ 143–150. Counts XIII and XIV are claims for fraud and deceit and negligent misrepresentation against Colombo for its assurances of payment of the debt incurred by Lillie, BBV, and BBH. Id. ¶¶ 151–169. Count XV asserts a civil conspiracy against all Defendants beginning in March 2025. Id. ¶¶ 170–175. Finally, Count XVI seeks punitive damages against all Defendants. Id. ¶¶ 176–182.

Defendants Lillie, BBV, and BBH (collectively the Best Beef Defendants) moved to dismiss the First Amended Complaint for lack of personal jurisdiction over any of the three Best Beef Defendants and failure to state a claim against Lillie. Doc. 20. Plaintiffs moved for an entry of default against Colombo, which the Clerk of Court granted. Docs. 23, 27. Colombo moved to set aside the default, Doc. 31, and this Court granted the motion, Doc. 37. Colombo then moved to dismiss for lack of personal jurisdiction and failure to state a claim. Doc. 43. Colombo's

counsel later withdrew leaving Colombo unrepresented at the hearing. Docs. 49, 50. Plaintiffs oppose both motions to dismiss. This Court held a hearing on the motions to dismiss on August 13, 2026, received in evidence various exhibits, and heard testimony from Joseph Schumacher, Brian Lillie, and SFCC's banker Jeff Scheel.

### B. Facts from the Evidentiary Hearing on Personal Jurisdiction[1]

The testimony at the evidentiary hearing demonstrated that the Plaintiffs and the Best Beef Defendants have very different versions of their business arrangement and what led to this dispute. What contacts the various Defendants had with South Dakota are not nearly as controverted.

Schumacher is a cattle rancher and farmer from Centerville, South Dakota. Schumacher operated SFCC to raise and sell wagyu cattle[2] and handles much of SFCC's business through verbal agreements and handshake deals. In the fall of 2023, Schumacher was interested in having SFCC's wagyu beef sold on the international market, which Schumacher thought would be more profitable than his domestic sales. Schumacher discussed this interest with Wes Austin, whom Schumacher met in 2023. Austin lives in Elk Point, South Dakota, and is the chief executive officer of his own South Dakota agribusiness, Our Family Farm, LLC. Austin knew that Lillie, through Best Beef, had marketed beef overseas and gave Lillie's phone number to Schumacher.

Lillie is the founder and chief executive officer of BBV and BBH and is the only common member of both entities. Lillie described BBV as a "trading company" that handles and markets

---

[1] This Court considers testimony and exhibits received during the evidentiary hearing for purposes of ruling on the motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). To survive a motion to dismiss under Rule 12(b)(2) after an evidentiary hearing, a plaintiff must prove personal jurisdiction by a preponderance of evidence. Creative Calling Sols., Inc. v. LF Beauty Ltd., 799 F.3d 975, 979 (8th Cir. 2015). Because this Court grants all Defendants' motions to dismiss for lack of personal jurisdiction, the Court need not address the factual allegations in the First Amended Complaint, Doc. 10. This Court is not making any factual findings in this opinion and order.

[2] Schumacher described wagyu beef as particularly marbled and natural in its production.

beef. BBV was incorporated in Missouri on August 31, 2022. Hr'g Ex. 1. Lillie explained that BBH, incorporated in Missouri on February 21, 2023, was in the "custom kill" industry, where facilities charge a fee for the slaughter and processing of livestock on behalf of the owner, rather than purchasing cattle. Hr'g Ex. 2. BBV and BBH did business with each other, but they are separate and distinct companies. Lillie's email domain is "bestbeef.com," and he signs as CEO of "Best Beef" on at least some correspondence. BBV holds the trademarks for Best Beef.

Lillie testified that he has never been to South Dakota, though he has lived in Iowa, Missouri, and now in North Carolina. The parties agree that the only two in-person meetings between Lillie and Schumacher occurred in Missouri. Between August 2024 and October 2025, there were some 340 phone calls, Hr'g Ex. A (Verizon phone records), between Schumacher and Lillie as part of the business relationship and dispute over payment thereafter. The two also exchanged texts and email messages, which were not offered in evidence at the evidentiary hearing.

The nature and extent of Austin's involvement in the deal between Schumacher's SFCC and Lillie's business is somewhat murky. Austin did not testify and was not present at the evidentiary hearing. Austin had dealings with both SFCC and the Best Beef Defendants. Lillie, or one of his businesses, extended Austin a one-time loan of $20,000.[3] The loan remains unpaid, and Lillie is not presently seeking to collect the debt. Schumacher or SFCC twice made $5,000 payments to Austin for him to seek out wagyu beef customers.

---

[3] Lillie testified that he never worked with Austin, but that Austin was interested in selling "Omega-3 cattle," to or through the Best Beef Defendants. Lillie characterized Austin as Schumacher's sales representative, though Plaintiffs appear to have had nothing to do with "Omega-3 cattle."

There is little material dispute over the substance of the initial 2023 conversation between Schumacher and Lillie. Schumacher called Lillie to introduce himself and discuss whether Lillie could help with international sales of wagyu beef. Schumacher recalled that Lillie spoke of the Best Beef operations in Hong Kong and Shanghai and evinced an interest in doing business with SFCC. Lillie testified, however, that he was not interested in the wagyu beef market because BBV concentrated on Angus beef. Schumacher remembered discussing with Lillie the number of wagyu cattle available to SFCC, the cattle's feed, and the process of selling beef internationally. Schumacher testified to talking about where he was based, making Lillie aware that Schumacher's wagyu cattle operation was located in South Dakota. Lillie did not recall whether Schumacher said he was operating in South Dakota and understood that Schumacher had access to wagyu cattle generally, not specifically in South Dakota. No other meaningful conversation occurred between the two in 2023.

In 2024, Schumacher called Lillie to resume their conversation about the international wagyu beef market. Schumacher lacked sophistication, expertise, and licensing to sell beef internationally that he understood the Best Beef Defendants to have. Schumacher and Lillie agree that they reached an agreement in 2024 but recount very different understandings as to what deal emerged.

Schumacher believed he formed a contract with the Best Beef Defendants for the sale of SFCC wagyu cattle. Under Schumacher's version of the oral contract, Plaintiffs' responsibilities were to provide wagyu cattle to the Best Beef Defendants for processing and to arrange trucking for the shipment of the cattle to the location designated by Lillie. The Best Beef Defendants were to pay Schumacher $2.45 per pound for live cattle and reimburse Schumacher for the trucking expense. According to Schumacher, the Best Beef Defendants were responsible for killing,

packaging, marketing and selling the wagyu beef. The Plaintiffs and the Best Beef Defendants would then split any net profits from the wagyu beef sales. Schumacher testified that the parties reached a second deal concerning the sale of frozen wagyu meat. At the time, Plaintiffs were storing about 250,000 pounds of frozen wagyu beef in Greeley, Colorado, and Des Moines, Iowa. Schumacher testified that the Best Beef Defendants were to sell the frozen meat overseas, and that he supplied a lead on a buyer in or exporter to Morocco, whom he had met on a trade mission with South Dakota officials to Mexico.

Lillie, on the other hand, testified that the oral agreement was a three-party joint venture. Indeed, Lillie testified that he was the one to suggest a joint venture, understanding that Schumacher had an international customer in Morocco for the wagyu beef. Under Lillie's version, SFCC was responsible for supplying wagyu cattle; BBV was to arrange to slaughter, package, and temporarily store the meat; and Austin or his entity was to handle marketing and sales. Any net profits from the joint venture would be shared among the three parties. According to Lillie, only one of the Best Beef Defendants—BBV—was involved in the joint venture and Schumacher was aware he was dealing with BBV throughout the parties' course of dealing. Lillie asserts there was never a deal for any of the Best Beef Defendants to buy anything from Plaintiffs, and the Best Beef Defendants were merely doing custom slaughter work. As for the frozen wagyu meat, according to Lillie, BBV merely agreed to store the frozen wagyu to help out Schumacher and did not buy the frozen wagyu meat for BBV to market or resell it.

The only writing that appears to contemporaneously memorialize *someone*'s idea about the transaction is an unsigned draft Agreement for the Sale of Live Wagyu Beef ("draft Agreement"). Hr'g Ex. H. The draft Agreement was written and signed only by Austin on June 19, 2024, predating SFCC's first shipment of wagyu cattle to the Best Beef Defendants by more than three

months. Id. at 3. Neither Schumacher nor Lillie accepts that the draft Agreement represents what meeting of the minds occurred. The draft Agreement briefly "outlines the terms for the sale of live Wagyu beef, including details on pricing, trucking, processing, certification, production, and the escrow arrangement for payment." Id. at 1. In part, the draft Agreement reads, "[e]ach company will share equally in the profits" and "[a]ny disputes or defaults will be resolved in the courts of South Dakota under South Dakota law." Id. at 2. While maintaining that he and Lillie entered into a different verbal agreement and describing the terms quite differently from the draft Agreement, Schumacher acknowledged at one point in his testimony that the terms of the unsigned draft Agreement were pretty much what was agreed on. Lillie testified that he declined to sign the draft Agreement because it was too unspecific.

Plaintiffs delivered two shipments of live wagyu cattle to the Best Beef Defendants. One shipment in multiple trucks arrived in August of 2024 and the other in September of 2024, to a kill plant in either Iowa or Missouri. See Hr'g Ex. B. All of the cattle had been born or backgrounded in South Dakota, with some coming from Schumacher's home site near Centerville, South Dakota, and some coming from feedlots where they had been fattened near Mitchell, South Dakota, and Billings, Montana. Id. Schumacher, representing SFCC, signed a Best Beef Supplier Affidavit on September 24, 2024, verifying that no antibiotics or hormones had been used and listing the "Supplier Address" as being rural Centerville, South Dakota. Hr'g Ex. C. The Best Beef Defendants' form reflected that the cattle had been "provided to Best Beef Holdings." Id. Lillie explained that BBH had "shackle space" available at a kill plant for BBV, the actual entity receiving the cattle from SFCC. SFCC supplied three other wagyu Beef Supplier Affidavits to the Best Beef Defendants dated August 5 and September 16, 2024, listing the feedlot address as Centerville, South Dakota. Hr'g Ex. D.

Plaintiffs around this same time shipped to BBV (according to Lillie) or the Best Beef Defendants (according to Schumacher) about 250,000 pounds of frozen wagyu meat from SFCC's temporary storage locations in Colorado and Iowa to a facility in Edgerton, Kansas. Schumacher described the frozen wagyu beef as being top quality, while Lillie testified that a portion of it was spoiled and not marketable. In October 2024, Lillie, via BBV, sent Schumacher's bank a wire transfer for $200,000. Hr'g Ex. J at 6; Hr'g Ex. 6, 7, 8. Per Lillie, the payment was an advance on what a San Antonio, Texas, business named Artran Supply, Inc., (Artran) associated with Moroccan buyers, was expected to pay for the frozen wagyu beef. BBV's wire transfer noted "ADVANCE DRAW WAGYU PROGRAM PROFIT SHARE." Hr'g Ex. 8. Schumacher testified that the $200,000 payment was a downpayment for the frozen wagyu beef and had nothing to do with Artran.

Plaintiffs discontinued providing cattle to the Best Beef Defendants after October of 2024. According to Lillie, BBV stored the frozen and butchered wagyu meat and incurred costs. Lillie or BBV sold some portion of the wagyu meat to cover the Best Beef Defendants' costs. Lillie never disclosed the amount of meat sold or income from sales to Schumacher and has provided no accounting. According to Lillie, the United States Department of Agriculture directed disposal of some of the frozen wagyu beef because it was rotten, and Austin removed some of the beef without the Best Beef Defendants' approval or prior knowledge.

The substance of the parties' subsequent discussions is disputed. Schumacher testified that Lillie acknowledged the debt owed, repeatedly assured Schumacher money was forthcoming, and several times asked Schumacher for wiring instructions to SFCC or Schumacher's bank. Schumacher also testified that he and Lillie came to a $5 million settlement agreement to resolve the Best Beef Defendants' debt to the Plaintiffs. Lillie contests all of this and recalls the $5 million

figure being the amount Schumacher said he needed to get square with his bank. Lillie testified that the project went poorly because the wagyu beef didn't sell and that the Plaintiffs owe money back for the Best Beef Defendants' expenses.

Plaintiffs' banker, Jeff Scheel, testified at the hearing. Scheel works for First Interstate Bank, in Aberdeen, South Dakota, where Plaintiffs' cattle was collateralized as a security interest for loans. SFCC was behind on loan payments in 2025, and Schumacher told Scheel he was awaiting payment for the cattle delivered to Best Beef. Scheel talked by phone at least twice with Lillie (either directly or on conference calls with Schumacher) and came away with the impression that the Best Beef Defendants owed money and would pay Schumacher once the Best Beef Defendants had access to capital. At one point, Scheel sought to validate the receivable, and Lillie sent an email stating he was expecting to receive funding from Colombo, which is a venture capital firm. Hr'g Ex. F at 2. In the same email, however, Lillie denied ever purchasing cattle from Schumacher. Id.

Colombo had no involvement in the 2024 business transactions between Plaintiffs and the Best Beef Defendants. Colombo is incorporated in Florida and has its principal place of business in Massachusetts. Doc. 48 ¶ 4. Colombo does no business in South Dakota, had no representative visit South Dakota, and entered into no agreement with the Plaintiffs. Id. ¶¶ 5–34.

In 2025, Lillie, as CEO of BBH, sought financing from Colombo to purchase a kill plant in Missouri. Plaintiffs and Austin had no involvement in BBH's efforts to purchase a Missouri kill plant. Information in the record indicates that a proposal for a $110 million dollar loan[4] from Colombo fell through, with Schumacher testifying that he understood in 2025 that the failure in

[4] Schumacher remembered hearing the initial financing could be $150 million, but the material of record and the Amended Complaint have the initial number as $110 million.

financing was due to misrepresentations from the Best Beef Defendants to Colombo. A later proposal for the Best Beef Defendants to get $40 million in financing from Colombo also failed to materialize. Colombo's CEO, McLaughlin, joined on one or two calls with Schumacher and Lillie. Scheel was on one such call and testified that neither McLaughlin nor Colombo made any guarantee of payment to Schumacher, though the call left Scheel hopeful that SFCC could get paid if Best Beef received financing. At some point, Schumacher asked Lillie to put in writing that Plaintiffs would be paid first when the Best Beef Defendants secured funding. Lillie did not. None of the Best Beef Defendants ultimately secured funding from Colombo. BBH apparently was involved with others in purchasing a kill plant but no longer owns it[5] or any assets at all. BBV owns the Best Beef trademarks and continues as a company transacting sales in the beef market domestically and internationally. Lillie testified that neither BBH nor BBV conduct any business in South Dakota.

Schumacher claims Lillie consistently promised to pay Schumacher for the delivered cattle and frozen meat and fabricated lies as to why he had not yet delivered the payment. Lillie claims Schumacher threatened Lillie and his daughter by referring to connections to the Montana mafia. The communication between the parties eventually ceased. Schumacher retained a lawyer and initiated this action, seeking over $6 million in damages.

## II. Motions to Dismiss for Lack of Personal Jurisdiction

### A. Legal Standard

The showing a plaintiff must make when a defendant contests personal jurisdiction under Rule 12(b)(2) depends on the stage of the case and the method the court employs to resolve the jurisdictional dispute. See K-V Pharm. Co. v. J. Uriach & CIA, S.A., 648 F.3d 588, 591–92 (8th

---

[5] Lillie said a New York private equity fund now owns the kill plant.

Cir. 2011); Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). At trial or after an evidentiary hearing, the plaintiff must prove personal jurisdiction by a preponderance of the evidence. Creative Calling Sols., Inc. v. LF Beauty Ltd., 799 F.3d 975, 979 (8th Cir. 2015); Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 647 (8th Cir. 2003). Plaintiffs must establish by a preponderance of the evidence that the Best Beef Defendants are subject to personal jurisdiction in South Dakota.

Colombo did not attend the evidentiary hearing, so a different standard applies in determining whether personal jurisdiction exists in South Dakota over Colombo. When ruling on a motion to dismiss without an evidentiary hearing, "the action should not be dismissed for lack of jurisdiction if the evidence, viewed in the light most favorable to [Plaintiffs], is sufficient to support a conclusion that the exercise of personal jurisdiction over [Defendants] is proper." Creative Calling Sols., 799 F.3d at 979.

A federal court sitting in diversity may exercise jurisdiction over nonresident defendants only if both the forum state's long-arm statute and the Fourteenth Amendment's Due Process Clause are satisfied. Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991). South Dakota's long-arm statute confers jurisdiction to the full extent permissible under the Due Process Clause. SDCL § 15-7-2; Kustom Cycles, Inc. v. Bowyer, 857 N.W.2d 401, 406 (S.D. 2014). Therefore, personal jurisdiction over the Defendants in South Dakota exists if it comports with due process. Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994).

Under the Due Process Clause, personal jurisdiction may be either general or specific. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924–25 (2011). Courts with general jurisdiction over a defendant may hear "any and all claims" against the defendant even if those claims are unrelated to the defendant's contacts with the forum state. Daimler AG v.

Bauman, 571 U.S. 117, 127 (2014) (quoting Goodyear, 564 U.S. at 919). For general jurisdiction to exist, the defendant's contacts with the forum state must be "so 'continuous and systematic'" that the defendant is "essentially at home" there. Goodyear, 564 U.S. at 919 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). None of the Defendants are subject to general jurisdiction in South Dakota.

Specific jurisdiction may be based on a defendant's solitary or irregular contact with the forum state. Daimler, 571 U.S. at 127. Specific jurisdiction exists when a defendant purposefully directs its activities at the forum state "and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)). Courts may exercise specific jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts" with the state such that having to defend a lawsuit there "does not offend traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316 (cleaned up and citation omitted). These minimum contacts must be based on "some act by which the defendant purposefully avails" himself of the forum state "such that he should reasonably anticipate being haled into court there." Burger King, 471 U.S. at 474–75 (cleaned up and citation omitted). It is the defendant, rather than the plaintiff, who must establish the minimum contacts in the forum state. Walden v. Fiore, 571 U.S. 277, 284 (2014). Moreover, the defendant's minimum contacts must be "with the forum state itself, not . . . with persons who reside there." Id. at 285; see also id. at 286 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliations with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (quoting Burger King, 471 U.S. at 475)).

Under Eighth Circuit precedent, five factors guide evaluating whether the constitutional requirements for personal jurisdiction have been met: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." K-V Pharm., 648 F.3d at 592 (cleaned up and citation omitted). The first three factors are the most important while the last two are secondary. Id. at 592–93.

Several counts of the First Amended Complaint claim breach of contract. "A contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." Id. at 593 (citing Burger King, 471 U.S. at 478–79). Personal jurisdiction does not "turn on 'mechanical tests or on conceptualistic theories of the place of contracting or of performance.'" Id. (quoting Burger King, 471 U.S. at 478). The Supreme Court has

> emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King, 471 U.S. at 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316–17 (1943)).

Several counts of the First Amended Complaint allege intentional torts. Specific personal jurisdiction in cases involving intentional torts is evaluated under what is known as the "effects test." Calder v. Jones, 465 U.S. 783, 787–79 (1984). Under this test, a defendant's tortious acts can establish personal jurisdiction where a plaintiff makes a prima facie showing that a "defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state,

and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—in the forum state." Kendall Hunt Publ'g Co. v. Learning Tree Publ'g Corp., 74 F.4th 928, 931 (8th Cir. 2023) (cleaned up and citation omitted). "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." Walden, 571 U.S. at 290. The Eighth Circuit "construe[s] the Calder effects test narrowly, and [has held] that, absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction." Johnson v. Arden, 614 F.3d 785, 797 (8th Cir. 2010).

### B. Specific Jurisdiction Over the Best Beef Defendants

The Best Beef Defendants contend that they are not subject to specific jurisdiction in South Dakota for four reasons: (1) Plaintiffs approached them to initiate the business relationship; (2) the Best Beef Defendants, or anyone on behalf of them, never traveled to South Dakota to negotiate any contract; (3) the Best Beef Defendants did not perform any obligation—no cattle or frozen beef were delivered, processed, packed or stored, or sold to any customer—in South Dakota; and (4) the Best Beef Defendants' purported contacts with South Dakota are not sufficiently related to Plaintiffs' causes of action. Doc. 22 at 10–19. BBH further contends that it did not have any relationship with Plaintiffs, and instead Plaintiffs contracted with BBV. Id. at 15–18. Lillie contends that he was at most acting as a representative of BBV and BBH, instead of on his own behalf and thus did not himself have the requisite minimum contacts with South Dakota. Id. at 18–19.

Plaintiffs counter that the Best Beef Defendants are subject to specific personal jurisdiction in South Dakota based on their agreements with Plaintiffs and their allegedly intentional and fraudulent misconduct directed at South Dakota. Doc. 25 at 3. Plaintiffs argue that the Best Beef

Defendants purchased cattle and beef raised in and from South Dakota, directed shipment from South Dakota, and accepted the benefit of that performance establishing an ongoing relationship with the forum. Id. at 11. Plaintiffs argue that the Best Beef Defendants, through Lillie, repeatedly sent communications into South Dakota to fraudulently induce Plaintiffs and assure them of payment, to "prolong reliance and secure forbearance" from the Plaintiffs. Id.

Under the first two factors of K-V Pharm., this Court examines the nature, quality, and quantity of the Best Beef Defendants' contacts with South Dakota. 648 F.3d at 592. Plaintiffs approached the Best Beef Defendants to pursue a business relationship. All negotiations and communications concerning that business relationship were by phone, e-mail, or text message. The Best Beef Defendants never had an agent travel to South Dakota. The parties have only met in person twice, both times at a plant in Missouri. The Best Beef Defendants do not own assets in South Dakota and, other than dealings with Plaintiffs and Austin, have no business in South Dakota.

The parties do not agree on much of the facts surrounding the terms and obligations of the contract. Plaintiffs allege that the Best Beef Defendants contracted to buy and pay for South Dakota wagyu cattle and frozen beef from Plaintiffs to market and sell, and to split net profits with Plaintiffs. The Best Beef Defendants aver that BBV entered a joint venture with SFCC and Austin's business, where BBV was contracted to custom slaughter, process, box, and warehouse the wagyu beef, but Schumacher and Austin were responsible for locating customers and selling the beef. A draft Agreement called for any disputes to be "resolved in the courts of South Dakota under South Dakota law," but neither Plaintiffs nor the Best Beef Defendants signed the draft Agreement or otherwise agreed to its terms. Hr'g Ex. H.

The parties dispute whether BBH was a party to any of the transactions at issue in this lawsuit. The draft Agreement had a blank signature line for "Best Beef LLC" by "Brian Lillie, CEO." Lillie is the CEO of BBH and BBV, but there is no "Best Beef LLC." The Best Beef Defendants submitted thirteen exhibits at the evidentiary hearing in support of their motion. The Best Beef Defendants' exhibits include a Certificate of Registration with the United States Patent and Trademark Office indicating BBV as the owner of three Best Beef trademarks, Hr'g Ex. 3, an offer and purchase order between BBV and a third party for the sale of wagyu beef, Hr'g Ex. 5, 6, and a wire transaction made by BBV to SFCC, Hr'g Ex. 8. Lillie, the only common member of both BBH and BBV, testified that he created BBH with five partners for purposes of doing custom killing. While BBH and BBV share the same brand and did business with one another, according to Lillie, BBH no longer owns anything.

Plaintiffs' eleven exhibits at the hearing included records showing 340 phone calls between Schumacher and Lillie, Hr'g Ex. A, and a Best Beef Supplier Affidavit with the "Best Beef" logo on it completed by Schumacher on behalf of SFCC for "cattle provided to Best Beef Holdings LLC ('Best Beef') . . . for slaughter by Best Beef," Hr'g Ex. C. Other than Schumacher's assertions that Lillie used BBH and BBV interchangeably throughout the parties' course of dealing and the one Best Beef Supplier Affidavit, Plaintiffs submitted no other evidence of BBH's connection to whatever agreement Schumacher and Lillie made or contacts with South Dakota.

Regardless of whose version of the deal is correct, Lillie for BBV agreed to receive, kill, process, package, and store (and perhaps market and sell) SFCC's wagyu cattle at a site outside of South Dakota, with some proceeds of the venture being remitted back to the Plaintiffs. Lillie for BBV directed Plaintiffs when and where to send the separate loads of cattle and beef, with cattle coming from both South Dakota and Montana. Once received outside of South Dakota, BBV

retained possession and control over the cattle and beef. Separately, Lillie apparently for BBV agreed to receive—whether that means buy for resale or merely store for SFCC—frozen wagyu beef from the Plaintiffs shipped from sites in Iowa and Montana to a location in Kansas. Despite Schumacher's initial understanding that the Best Beef Defendants included Lillie, BBV, and BBH, it appears that only Lillie and BBV were involved in the course of dealing or subsequent conduct, with BBV making use of BBH's shackle space at a kill site outside of South Dakota.

Lillie—whether personally or for BBV—had some 340 phone calls with Schumacher over the 13-month period in question and other email messages and text communications. Lillie also had phone calls and emails with SFCC's South Dakota banker about the program's financing. BBV made a single $200,000 wire transfer to Schumacher's South Dakota bank but otherwise paid nothing to the Plaintiffs. Plaintiffs also assert that the Best Beef Defendants and Plaintiffs reached a third verbal agreement after Lillie had communications with SFCC's South Dakota banker, although Lillie maintains there was never any such settlement of claims.

The nature, quality, and quantity of BBH's contacts with South Dakota do not justify personal jurisdiction over BBH, but the existence of specific personal jurisdiction over the BBV and Lillie is a closer call. Older Eighth Circuit decisions provide some argument for specific jurisdiction over the BBV and Lillie. See, e.g., Papachristou v. Turbines, Inc., 902 F.2d 685, 686 (8th Cir. 1990) (en banc) (finding specific jurisdiction where the defendant traveled once to the forum state and contract performance was entirely within the forum state); U.S. Kids, 22 F.3d at 820 ("All that is required is that a commercial actor purposefully direct its efforts toward residents of the forum state, as we believe U.S. Kids has done."). More recent Eighth Circuit decisions, however, make clear that all the Best Beef Defendants lack the requisite minimum contacts to South Dakota to expose them to personal jurisdiction here.

In recent decisions *finding* specific personal jurisdiction, the Eighth Circuit pointed to certain specific contacts as instructive, such as the defendant first reaching out to the plaintiff, visiting the forum state, or performing the contract in some way within the forum state. See e.g., Whaley v. Esebag, 946 F.3d 447, 451–52 (8th Cir. 2020) (finding personal jurisdiction where the defendants twice traveled to the forum state, shipped products into the forum state, and sought a connection to a separate business headquartered in the forum state); Creative Calling Sols., 799 F.3d at 980–81 (finding personal jurisdiction where the defendants first contacted the plaintiffs and shipped thousands of product samples into the forum state); Wells Dairy, Inc. v. Food Movers Int'l, Inc., 607 F.3d 515, 520 (8th Cir. 2010) (finding jurisdiction where the defendant first reached out to the plaintiff, requested to purchase plaintiff's products on credit, engaged in eleven transactions, and faxed more than 100 purchase orders to the forum state); K-V Pharm., 648 F.3d at 594–97 (finding jurisdiction where the defendant traveled to the forum state and made payments under the executed contract).

For example, in Wells Dairy, 607 F.3d at 520, the Eighth Circuit distinguished Scullin Steel Co. v. National Railway Utilization Corp., 676 F.2d 309 (8th Cir. 1982) (lacking specific jurisdiction), and discussed facts differentiating the cases. In both Wells Dairy, and Scullin Steel, the defendants "had no office, agent, personnel, or real property within the forum state," and the plaintiffs "manufactured the product, received payment, and delivered the product in the forum state." Wells Dairy, 607 F.3d at 520. The "[i]mportant differences" justifying specific jurisdiction in Wells Dairy included that the defendant solicited the plaintiff's business, "sought and applied for credit from [the forum] company," had an ongoing business relationship, and "received [plaintiff's products] in [the forum] and simultaneously transferred possession and title to its customers." Id. By contrast, Schumacher first reached out to the Best Beef Defendants and did

not deliver cattle to the Best Beef Defendants in South Dakota. The Best Beef Defendants were never physically present in South Dakota and never contemplated shipping or selling any products in South Dakota. At the outset, the nature and quality of the Best Beef Defendants' contacts weigh against asserting specific jurisdiction.

Many analogous and recent Eighth Circuit cases undermine Plaintiffs' arguments that the Best Beef Defendants' conduct establishes specific personal jurisdiction in South Dakota. See Pederson v. Frost, 951 F.3d 977, 980 (8th Cir. 2020) (finding "hundreds of phone calls and emails" to be insufficient without "allegation . . . that these communications were part of some broader effort by the defendants to create a connection with [the forum state]"); Morningside Church, Inc. v. Rutledge, 9 F.4th 615, 620–21 (8th Cir. 2021) (finding no specific jurisdiction over a constitutional violation claim where none of the defendants visited the forum state, and the defendants only contacts with the state were "isolated letter and calls"); Bros. & Sisters in Christ, LLC v. Zazzle, Inc., 42 F.4th 948, 952–53 (8th Cir. 2022) (finding specific jurisdiction to be lacking where the defendant made a single sale to the forum state and maintained a nationally available website); Fastpath, Inc. v. Arbela Techs. Corp., 760 F.3d 816, 823 (8th Cir. 2014) ("Even if Arbela solicited the Agreement knowing that Fastpath was an Iowa corporation, that knowledge cannot create minimum contacts with Iowa because 'the plaintiff cannot be the only link between the defendant and the forum.'" (quoting Walden, 571 U.S. at 285)); Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 594 (8th Cir. 2011) ("[Defendant's] contacts with [the forum]—scattered e-mails, phone calls, and a wire-transfer of money to [Plaintiffs] in [the forum]—do not constitute a 'deliberate' and 'substantial connection' with the state such that [defendant] could 'reasonably anticipate being haled into court there.'" (quoting Burger King Corp., 471 U.S. at 474–75)).

The most analogous case—one from thirty years ago when personal jurisdiction analysis was at least arguably looser—indicates that asserting specific jurisdiction over the Best Beef Defendants would be improper. See Bell Paper Box, Inc. v. Trans W. Polymers, Inc., 53 F.3d 920 (8th Cir. 1995). In Trans W. Polymers, a South Dakota seller sued a California corporation for breach of contract. Id. at 921. There, the defendants had sent the plaintiffs "a purchase order for packaging which [the plaintiffs] would manufacture in South Dakota," which, by its terms, was to be "construed in accordance with the laws of South Dakota." Id. (cleaned up). After the dispute arose, the president of the California corporation visited South Dakota to discuss, among other things, a potential settlement. Id. Nevertheless, the Eighth Circuit found that the South Dakota district court lacked specific jurisdiction over the California corporation and noted that "[m]erely entering into a contract with a forum resident does not provide the requisite contacts between a [nonresident] defendant and the forum state." Id. at 922 (quoting Iowa Elec. Light & Power Co. v. Atlas Corp., 603 F.2d 1301, 1303 (8th Cir.1979)). "This is particularly true," the Eighth Circuit explained, "when the nonresident defendant is a buyer, rather than a seller," and the seller solicited the buyer's business. Id. "Although [the defendants] fully anticipated performance by [plaintiffs] in South Dakota, 'foreseeability' [of an impact within the forum] alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." Id. (quoting World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980)).

Taken as a whole, the Best Beef Defendants' actions did not create a "substantial connection" to South Dakota. McGee v. Int'l Life Ins., 355 U.S. 220, 223 (1957). The Best Beef Defendants did not have business in, or contact with, South Dakota other than through the Plaintiffs. Cf. Whaley, 946 F.3d at 452 (underscoring the defendants' desire to connect with a non-party business in the forum state). Under either parties' understanding, the transaction

involved SFCC shipping cattle *out of* South Dakota, rather than the Best Beef Defendants sending any products *into* the forum. Trans W. Polymers, 53 F.3d at 922. What's more, the only choice of law provision appeared in the unsigned draft Agreement, Hr'g Ex. H, which neither party felt reflected the terms of the transaction, and the Best Beef Defendants' contacts related to Plaintiffs' breach of settlement claims are of the sort that courts give minimal weight. Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd., 89 F.3d 519, 523 (8th Cir. 1996) ("[C]ourts have hesitated to use unsuccessful settlement discussions as 'contacts' for jurisdictional purposes."). The 340 phone calls between parties are analogous to those in Pederson, which were insufficient to justify specific justification. 951 F.3d at 980.

The Calder test does not change this conclusion. Bros. & Sisters in Christ, 42 F.4th at 954 (describing the Calder test "merely as an additional factor to consider when evaluating a defendant's relevant contacts . . . meaning that absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction." (cleaned up and citation omitted)). "First, the relationship must arise out of contacts that the defendant has created with the forum state. Second, it is the defendant's contacts and conduct with the forum state *itself* that are the focus, not the defendant's contacts with people who happen to reside there." Pederson, 951 F.3d at 981 (explaining limitations on the Calder test) (cleaned up and citations omitted). Lillie did not independently contact SFCC's banker to discuss business or paying SFCC; those communications occurred at Schumacher's behest. Any harm felt by Plaintiffs or their bank was a result of Plaintiffs' dealings with the Best Beef Defendants, not the Best Beef Defendants' connections to South Dakota. Viasystems, 646 F.3d at 594 ("Nor can jurisdiction be based on the effects on [plaintiffs] in [the forum state] of [defendants'] refusal to pay [ ] replacement costs in full."); see also Bros. & Sisters in Christ, 42 F.4th at 954 (looking for "facts suggesting that [defendant]

uniquely or expressly aimed its allegedly tortious act" at the forum state (citation omitted)). The first two factors from K-V Pharm. weigh against asserting specific jurisdiction.

Next, this Court considers the relationship of the contacts with the causes of action. K-V Pharm., 648 F.3d at 592. Plaintiffs assert several causes of action against the Best Beef Defendants including breach of contract and promissory estoppel. Whether characterized as a contract for the purchase of cattle and frozen beef or a three-way joint venture, the Plaintiffs' agreements with the Best Beef Defendants involve South Dakota cattle, some of which were fattened in Montana, being shipped out of South Dakota and Montana to be processed, packaged, and resold with proceeds to be remitted back to South Dakota. Like Trans W. Polymers, this arrangement contemplates an out-of-state buyer purchasing products from the forum but never entering the forum state. 53 F.3d at 921.

Plaintiffs also allege the Best Beef Defendants committed intentional torts including fraud and deceit, conversion, tortious interference with business expectancy, and intentional infliction of emotional distress. The Plaintiffs alleged that the Best Beef Defendants' actions in this regard were intentional and aimed at the forum state because the Best Beef Defendants intentionally and repeatedly communicated false assurances about the program, payment, and financing into South Dakota. See Kendall Hunt Publ'g Co., 74 F.4th at 931. The Best Beef Defendants allegedly made these false assurances, including offering Plaintiffs $5 million in a settlement agreement, to string Plaintiffs along before Plaintiffs' attorney sent a formal demand letter to the Best Beef Defendants. The Best Beef Defendants allegedly communicated to Plaintiffs and their banker that payment would be forthcoming, thereby exposing the South Dakota bank to financial exposure. All of these tort claims relate to promises to pay amounts owed for breach of contract allegedly intended to

produce reliance in South Dakota. The third K-V Pharm. factor is neutral as to the contract claims and marginally favorable to jurisdiction over the tort claims.

The final two K-V Pharm. factors are the forum state's interest in the case and the convenience of the parties. 648 F.3d at 592. South Dakota has an interest in this case because South Dakota has both an interest in protecting its residents from torts and from breach of contract. Tiffany Indus., Inc. v. Comm. Grain Bin Co., 714 F.2d 799, 802 (8th Cir. 1983) (per curiam) (finding that a state has an interest in enforcing contracts) (abrogated on other grounds); Bill Johnson's Rests., Inc. v. N.L.R.B., 461 U.S. 731, 745 (1983) (finding that a state has an interest in the health and welfare of its citizens). Thus, the fourth K-V Pharm. factor weighs in favor of asserting specific jurisdiction. Plaintiffs are in South Dakota, and the Best Beef Defendants are in Missouri and North Carolina. Thus, travel will be necessary wherever this case is venued, and the fifth K-V Pharm. factor is neutral.

Assessing all factors from K-V Pharm., Plaintiffs have failed to establish by a preponderance of the evidence that the Best Beef Defendants are subject to specific personal jurisdiction in South Dakota. There is insufficient evidence that BBH was a party to any of the transactions that gave rise to this dispute. Lillie and BBV's contacts are insufficient under Eighth Circuit precedent to establish the requisite minimum contacts to South Dakota. Lillie and BBV entered into oral agreements with a South Dakota cattle rancher for him to supply cattle and beef and for remission of some proceeds back to South Dakota. Neither Lillie nor any agent or representative from BBV traveled to South Dakota. Nothing in the alleged terms of the agreement—under either party's impression—indicate that Lillie or BBV would be required to visit South Dakota or send any products into South Dakota. The Plaintiffs felt harm from Lillie or BBV's alleged failure to pay and false assurances and subsequently connected Lillie or BBV with

their South Dakota bank. While Lillie or BBV may have repeated these assurances to Plaintiffs' bank, Lillie or BBV's sole connections to South Dakota remain by and through the Plaintiffs and Austin who had some perhaps lose affiliation with the Plaintiffs. Considering the totality of circumstances, the Best Beef Defendants' contacts are insufficient to comport with Due Process. The Best Beef Defendants are not subject to specific personal jurisdiction in South Dakota for Plaintiffs' claims against them.

### C. Specific Jurisdiction Over Colombo

Colombo contends that it is not subject to personal jurisdiction in South Dakota because it has not purposefully availed itself of the benefits and protections of South Dakota. Doc. 44 at 15. Colombo did not appear at the evidentiary hearing on August 13, 2026. Colombo submitted that it "has no South Dakota office, property, employees, bank accounts, registration, registered agent, or regular business operations." Id. at 15–16. Colombo argued that personal jurisdiction cannot rest solely on alleged telephone and email communications concerning potential financing for an out-of-state resident and business. Id. at 16. Thus, Colombo maintains that it has not purposefully targeted South Dakota and that the contacts are "'random, fortuitous, or attenuated' because Plaintiffs are the only alleged link between Colombo and South Dakota." Id.

Plaintiffs counter that South Dakota was integral to the communications because Colombo CEO McLaughlin knew that he was communicating to a South Dakota rancher and banker when providing the alleged false assurances of financing the Best Beef Defendants in 2025. Doc. 45 at 11. Plaintiffs contend that, as a result of Colombo's communications, a South Dakota rancher extended his financial exposure and a South Dakota bank delayed enforcing its remedies to secure the debt. Id. Plaintiffs contend that their claims directly arise from this conduct directed at South Dakota because Colombo's assurances caused the injury sustained in South Dakota. Id. at 15–16.

Even taking the facts in the light most favorable to Plaintiffs, Colombo is not subject to specific personal jurisdiction in South Dakota. Colombo had no role in the 2024 transactions that led to the Best Beef Defendants allegedly owing sums to the Plaintiffs in South Dakota. Colombo's involvement was only in connection with possibly financing the Best Beef Defendants after the Plaintiffs' relationship with the Best Beef Defendants had soured. Colombo's contacts with South Dakota were sparse. Plaintiffs submitted evidence that McLaughlin communicated with Schumacher and Schumacher's banker on two or three occasions about the Best Beef Defendants receiving financing from Colombo. Hr'g. Ex. F. Colombo did not guarantee any payment to Plaintiffs, nor did the Best Beef Defendants ever receive money from Colombo. These two or three phone calls and handful of emails are not sufficient to establish personal jurisdiction over Colombo. See Pederson, 951 F.3d at 980 (finding "hundreds of phone calls and emails" to be insufficient without "allegation . . . that these communications were part of some broader effort by the defendants to create a connection with [the forum state]"); id. at 980–81 ("Because [plaintiff] just happens to work and maintain an office in Minnesota, these contacts fit into the 'random, fortuitous, or attenuated' category." (citing Walden, 571 U.S. at 285–86 ("[T]he plaintiff cannot be the only link between the defendant and the forum."))); Morningside Church, 9 F.4th at 620–621. (finding letters and calls to plaintiff in forum state to be insufficient to establish personal jurisdiction); id. at 620 ("These communications were directed at Missouri simply because [Plaintiffs] just happened to reside there—had they been in California or Iowa, the defendants would have reached out to them in those states instead." (cleaned up and citation omitted)). Accordingly, the first and second factors—the nature and the quality of the defendants' contacts with South Dakota, as well as the quantity of those contacts—weigh against personal jurisdiction.

Plaintiffs cite to the Supreme Court of South Dakota decision in J and L Farms, Inc. v. Jackman Florida Wagyu Beef, LLC, 7 N.W.3d 695 (S.D. 2024), to argue that this Court has specific personal jurisdiction over Colombo. The J and L Farms decision, of course, is not binding on this Court on a Constitutional question and involved a three-to-two split vote. Regardless, J and L Farms is distinguishable. In J and L Farms, the court held that a Florida bank that guarantied payment for wagyu cattle transactions in South Dakota was subject to personal jurisdiction in South Dakota. Id. at 700–704. The guaranties the bank sent "were expressly directed to [plaintiff], signed by an officer of [the bank], and unambiguously guarantied payment up to $85,000 to [plaintiff] for the purchase of cattle." Id. at 701. "These guaranties were not general in nature but bound [the bank] to pay [plaintiffs] up to $85,000 for each of the three shipments of cattle." Id. at 703. Here, Colombo did not guarantee any amount to Plaintiffs for the shipment of cattle and indeed had no involvement at all in 2024 when the shipments occurred. Indeed, disputes over what the Best Beef Defendants owed Plaintiffs existed before Colombo's involvement as a private equity firm exploring possible financing of the Best Beef Defendants' operations. Thus, Plaintiffs' reliance on J and L Farms is unavailing.

Plaintiffs contend that jurisdiction is still appropriate because the alleged tort occurred in South Dakota where they received Colombo's communications. Yet, where the alleged tort was committed in the same way in Pederson, the Eighth Circuit held that the first three factors all weighed against jurisdiction. 951 F.3d at 980 (finding defendant accused of committing fraud via communications sent to plaintiff in Minnesota, which is where he received and relied on defendants' representations, weighed against finding personal jurisdiction). As the Eighth Circuit explained, "it is the defendant's contacts and conduct with the forum state *itself* that are the focus,

not the defendant's contacts with people who happen to reside there." Id. at 981 (cleaned up and citation omitted). Thus, the third factor also weighs against a finding of personal jurisdiction.

The last two factors from K-V Pharm. offset each other. As explained above, South Dakota has an interest in protecting its residents from torts and providing a forum to redress injuries. Yet, Plaintiffs are from South Dakota and Colombo is not from South Dakota and has no business in the state. Considering all five factors together, this Court concludes that Colombo is not subject to specific personal jurisdiction in South Dakota for the claims asserted against it.

## III. Transfer or Dismissal of Case

This leaves the decision to dismiss or transfer the case. Under 28 U.S.C. § 1406 and 28 U.S.C. § 1631, this Court has discretion to, in the interests of justice, transfer this matter to "any other court…in which the action or appeal could have brought at the time it was filed or noticed." This Court can dismiss the matter without prejudice so that Plaintiffs can re-file, presumable in the United States District Court for the Western District of Missouri. However, the parties may favor transfer of the case in the interests of justice to avoid further delay in resolving this dispute. In case the parties agree that transfer of the case would be in the interests of justice, this Court will withhold dismissal without prejudice for thirty days.

## IV. Conclusion

For the reasons explained above, it is

ORDERED that the Best Beef Defendants' Motion to Dismiss, Doc. 20, is granted. It is further

ORDERED that Colombo's Motion to Dismiss, Doc. 43, is granted. It is further

ORDERED that judgment of dismissal without prejudice is withheld for thirty days to allow the parties time to file a joint motion to transfer if they so agree.

DATED this 15th day of September, 2026.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE